The clerk will call the case. Case number 23-8004, In Re Insight Terminal Solutions. Argument not to exceed 15 minutes per side. Mr. Kaplan, you may proceed for the appellant. Good morning. I may please the court. Michael Kaplan on behalf of Insight Terminal Solutions. Just as a matter of course, I'd like to take three minutes for rebuttal time. Thank you. Your Honors, there were two principal errors in the proceeding below. The first related to the decision not to admit the testimony of Mr. Siegel via deposition. And the second relating to the bankruptcy court's failure to disallow the claim under the 502 analysis. I'll address the deposition testimony first, if Your Honors don't mind. It's interesting because we're kind of focused on Mr. Siegel's testimony a little bit too much on the fact that it was a deposition and in some respects not enough that it was a deposition. And I say that because Rule 32 of the Federal Rules of Civil Procedure do not have a requirement that the deposition be complete. It is. Does Rule 32, did it require the trial court to admit the evidence? Is it required? It is not required that they. So the trial court had discretion to admit or not? Well, Your Honor, the trial court had discretion based on, it needed to look to be guided by the rules and look to the standard hallmarks that we look at in evidentiary decisions. And the standard hallmarks, if you look to Rule 32, were otherwise permissible by evidence. What we're looking for is, is there some reason to believe that this testimony is faulty? And that's why I say we're not. Don't we typically rely on cross-examination to test reliability? In a deposition, Your Honor? In general, in terms of admitting. You're talking about admitting evidence at trial. Yes, Your Honor. And, and the hallmark, at least strikes me, the hallmark is reliability of the evidence, right? Absolutely, Your Honor. And traditionally, trial courts for testimonial evidence require or rely on cross-examination to test bias, perception, the other, you know, I can't, I'm not going to go that far back to law school, but you got what I got for you. I got it. And your answer, Your Honor, is this is why, again, the fact that it was a deposition, I think, is what is making this analysis a little more complicated. Under Rule 801D2 of the Federal Rules of Evidence, and I'll address why it was appropriate to use it against Baybridge in a moment, to be completely candid, Your Honor, I could have been sitting in the hallway of the courthouse here, overheard a conversation by Mr. Siegel and someone else, and then been a properly identified declarant to come in and testify because the rule is a statement of a party opponent. In that particular instance, there would be no cross-examination, although I certainly would not mind cross-examining them otherwise. But the reality is, is the statement, it's a, the hearsay exception allows me, because of who Mr. Siegel is and in what capacity he is. But who's the party? That we use, we're using it against? You're suggesting the statement can be admitted against a party opponent? Yes, Your Honor. And my understanding was that was, that Baybridge is not the same thing as Cecilia. Your argument is they're the same? No, Your Honor, I want to clarify. My argument is, is that Cecilia was never dismissed from the case, and their decision not to attend trial or participate was done so at their own risk. So then how do you square that with, with section, with Rule 105, I think it is, that said evidence can be admitted against one but not all? Or it could be admitted for one purpose, but not every purpose? You're absolutely right, Your Honor. It, there's, I don't think I need to square it because the party opponent in this case was still Cecilia. The, the notion that Baybridge substituted the claim, they did a transfer under 3001, there is no case law court decision or otherwise that allows a party to simply sub out of an adversary proceeding post-confirmation on a claim transfer 15 days before the hearing and say, okay, they're out, they're not here. Cecilia was still a party opponent. The only parties that had been essentially dismissed from the case. But you want to admit it against Bay, Baybridge or Bayview? No, Your Honor. I want to admit it against Cecilia. Cecilia did not attend the trial. They did so at their own peril. Then is it not to be admitted against Baybridge or Bayview? In my view, it's not being admitted against Baybridge. Baybridge, again, is the intervener who came into the case. They have certain rights and otherwise against Cecilia based on their transfer. But the adversary here, and still, Your Honors, is Cecilia. It is ITS versus Cecilia and is the Cecilia proof of claim. What does rule 3002 mean in the transfer context? Where it says after the transfer, you know, the transferee gives notice or the clerk gives notice to the transferor if there's no opposition from the transferor, then the rule says transferee is substituted. What does that mean? Well, Your Honor, it means in the pre-confirmation context, that would mean if they had done that before the plan was confirmed, or even before the adversary proceeding were filed, then Baybridge would have been the proper defendant. They didn't. They did it after we filed this claim, after confirmation occurred, and really 15 days before the trial, and really, Your Honors, as a way to try and avoid what was very damaging testimony from Mr. Siegel. I mean, the rules can't permit you to simply transfer a claim where we have no opportunity to object, no recourse whatsoever to go back, and simply say, yeah, that guy gave some really bad testimony. We're just not going to have them show up at trial, and now it can't be used against them. That's not fair, and that's not equitable by any stretch of the imagination, Your Honors. Well, you're saying you can use it against Cecilia, but Cecilia and the secure creditor that foreclosed on the proof of claim are separate, aren't they? They are two absolutely separate entities. There's no question. We are not arguing for this purpose that Cecilia and Baybridge are the same entity. What I am arguing, though, Your Honors, is you want to tag them with the consequences of it. To be completely candid, Your Honor, we argued that Baybridge didn't belong in the case to begin with when that issue first came up. Whatever financial arrangement Baybridge and Cecilia made, by and amongst themselves, which we had no opportunity to object to or otherwise insight into. Did you have that right to? To object to it, Your Honor? I don't know that we did have a right necessarily to object to the claim. That's not what the rule provides. It's the transferor and the transferee, and we were neither. So what I understand you're saying is they quit-claimed the claim from Cecilia to Baybridge, and whatever Baybridge got was what Cecilia had. Is that your position? Yes, Your Honor. Because the testimony was contrary to Cecilia's interest, I should have been allowed to knock out the underlying claim as the testimony against the party opponent. Yes, Your Honor. I mean, we started this case with one plaintiff and three defendants, and the defendants were Cecilia, Hallis, and Oasis. Oasis and Hallis were taken out on summary judgment using the exact same record evidence that the bankruptcy court didn't want to use at trial. They just didn't appear, did they? They didn't appear, Your Honor. In opposition to the summary judgment motion. They did not file in opposition to the summary judgment. They were still very much in the case. We know they're still very much in the case because when the motions to quash come up, it's the same lawyers who are appearing to fight the motions to quash. So they did not contest it. You're absolutely correct. But truth be told, Your Honor, we believe that the record evidence, there really wasn't much to contest. I mean, I don't want to get ahead of myself and assume that you're going to admit the deposition, but the deposition he said, Mr. Siegel said very candidly, without any equivocation, we papered these documents in case someone from Kirkland came and started looking at them. He, you know, that's what the testimony was. And so the notion here is we use this testimony in a perfectly permissible way against Cecilia. The fact that Baybridge, to Mr. Jones's credit, arrived and advocated at the hearing, they did so at their own choice. But Cecilia's decision not to come was one of their own. They were not and have not been dismissed from the case to this day. So after they transferred the claim, they should continue advocating for the claim? Well, Your Honor, I would think that they would insofar as that if, and I don't want to recharacterize, they in essence transferred to Baybridge nothing. And I'm assuming that, I would assume that Baybridge would maybe not like that deal. Now you brought up the comment of recharacterization. Yes, Your Honor. Did Cecilia or Baybridge have an equity interest in the debtor to begin with? Did Cecilia or Baybridge? Baybridge did not have an equity interest in the debtor. They could have. That's not the question. They didn't have, right? They did not, Your Honor. There's only one member. All right. What about Cecilia? Cecilia, no. Cecilia was not an equity holder. Okay. So how are you going to argue to recharacterize debt equity to someone who has no equity in the debtor? Well, Your Honor, we're doing so because when we look past the true nature of the transaction here, you have all the same people, the Siegel family, on every side of this transaction. It was, Mrs. Siegel was the sole with her children were the quote unquote members of Cecilia. Mr. Siegel was the non-member manager of it. So was it per se forbidden for equity or someone who's not even quite an affiliate to make a loan to a related company? No, Your Honor. So what is it that justifies the recharacterization? Where is the abuse of the corporate form, which is I think how the trial court approached it? Your Honor, the abuse of the corporate form here is that you had no other parties. You had Mr. Siegel on one hand and you had Mr. Siegel on the other hand, and Mr. Siegel was making a deal with Mr. Siegel. And he said so in his deposition. If you look, they simply papered these notes because they wanted to see, they wanted to keep track of how much they were putting out. There was no interest rate. Is there anything illegal about this? Your Honor, I don't think this is a question of illegality. I think it's a question of equitableness as it relates to this case and whether it should be recharacterized. So not illegal, sir, but the bankruptcy court has the power to look beyond what the document is labeled as and look to the true nature of the transaction. The true nature of the transaction was that Mr. Siegel was moving money from various family entities into this entity in hopes of being able to monetize the sublease. Can you cite to me law that says you can recharacterize debt to equity to someone who has no original equity? I don't believe we cited a case as to that. But I do want to turn now quickly to the piece about the disallowance, which is separate from the recharacterization, which is that even if you weren't able to recharacterize the entirety of the claim, we presented unrefuted evidence that just over $4 million of the claim did not reflect transfers from Cecilia to ITS. I mean, we went through line by line of the charge, your honors, to say that this wasn't the money. For instance, we had $250-something thousand dollars, which was money that HALIS had paid to ITS. That should have been on the HALIS proof of claim, which was disallowed. We had $486,000, which represented the operating losses for OASIS, which was the airplane. Were these claims then baked into the restated notes? They were listed on the lines of the restated notes, your honor. Is there something that says that someone can't, in a promissory note, agree to pay any debt? I mean, the trial court approach is essentially a matter of consideration, right? Peppercorn and all that. Why is it impermissible for us to look at the promissory note that says the successor assumed the obligations of the predecessor? Well, it assumed the assets, your honor, the promissory note. It doesn't say it assumed the liabilities of the predecessor. So if you look back to the... But the promissory note is not concerned with assuming liabilities? It's concerned with assets? Well, your honor, looking back to the initial transfer in which they changed the first name from ITS to, excuse me, from ITH to ITS, right? It only said that they transferred the assets. There was no mention of liabilities. I see my time has expired. Any other questions I can answer? Thank you, your honors. Thank you. Good morning, your honors. I'm Roger Jones on behalf of Baybridge. I'd like to address just a couple of points while I have them. With respect to Rule 801D2, I think the argument made in the question asked is whether, as a successor in interest, Baybridge was bound by the statements made by Cecilia. The answer to that is absolutely not, your honor. There's a Sixth Circuit decision on this, Calhoun v. Baylor. We cited in our papers, your honor, 646F2D1158. So we're not bound by those as a successor in interest and they were not our statements. They were Cecilia's statements. And the court is exactly right. The effect of the transfer, which was more than 15 days prior to the trial, that the effect of the transfer was to set the claim was to substitute Baybridge for Cecilia. That's what 3001E says. And so that substitution occurred. And Cecilia was no longer a party. They were not present at trial. They were still on the caption, that's true, but they were not present at trial. And we know if we look at various decisions, courts have required that the statements must be adverse to a position taken by the party, the opposing party, at trial. Well, here Cecilia was not there. They took no position. They weren't even present. They had been substituted out of the case. And so that deposition could not be offered against Baybridge. In the papers, Mr. Kaplan confuses issues of admissibility and weight. As the court knows, Judge Lloyd found that even if she admitted the deposition, she would not afford it much weight, if any, at all. And the reason she did that was the lack of cross-examination. And they admit in their papers that an incomplete deposition can be excluded. They admit it in their papers. Can be excluded. Here, the judge excluded it, but also then considered the deposition and the weight that would have been given to it had it been admitted, and she found it would not be given any weight. They do not challenge, well they make one argument regarding the weight to be given to the deposition. And that argument is very confusing, Your Honor. They say, page 14 of their brief, that the court should have evaluated the weight to be given Mr. Siegel's deposition, should have evaluated under Rule 807 of the hearsay rules, which is the catch-all exception. That confuses weight and admissibility. And moreover, Rule 807 was never argued by ITS at trial or any other time. They didn't raise 807. They raised 804, they raised 802, but they never raised 807. They make a statement in their papers that they raised it in connection with the subpoenas, which is the second evidentiary issue that is argued here. They raised it in connection with the subpoenas. That is true, Your Honor. And they raised it as an argument for the admission of business records. Not for the admission of Mr. Siegel's deposition, but for business records. They never raised Rule 807 with respect to. So in your opinion, they waived it? Your Honor, I think that's the law of this court, unless it's plain error. If you look at Rule 807 and the cases under Rule 807, they say that the party seeking admission of the evidence under 807 has the burden of proof to show that the evidence falls within Section 807. Here, they never even raised it, let alone made a showing that this evidence fell within Rule 807. It simply wasn't raised. So yes, I don't think it's plain error, Your Honor. So I do think it's waived. That's correct. And moreover, 807 has nothing to do with the weight to be given evidence. It only relates to admissibility. And so that's their only argument with respect to the judge's decision regarding weight. Now isn't there something unseemly about Mr. Siegel and his universe of related companies funneling money in and then getting to bankruptcy and then saying, treat me as a creditor? Is there something unseemly about that? I don't think so. And if so, is the Bankruptcy Court powerless to address this kind of, in his view, you know, shenanigans? Powerless to address shenanigans? We're going to take all this big piggy bank we have and we're, oh, they need money to keep this option afloat? Well, we'll just take it from this piggy bank as part of this larger universe. Is that exalting form over substance to allow that? Bankruptcy courts can cut through stuff like that all the time, right? Why not here? Your Honor, one, evidence of shenanigans, as the court calls it, that would depend on the admission. I'm hypothesizing. Understood. That would require the admission of Mr. Siegel's deposition. Because absent that, we have very little evidence at all regarding any so-called shenanigans. What we have in the record is very little evidence regarding the ownership or management of any of these entities. And the reason for that is the evidence regarding that is limited to the stipulation. And the stipulation only says a very few things about ownership. It says that ITH was the sole member of ITS. It says that Mr. Siegel was the non-managing member of ITS and Cecilia. We don't have the operating agreements. They're not in the record. We don't know whether Cecilia or ITS was board managed, member managed. We have no idea because that's not in the record. If you were trying to address shenanigans, Your Honor, there would be ways to do that under state law. A court could apply, for example, could have pierced the corporate veil. And they make no case for that here, for piercing the corporate veil. There are not enough facts in the record to pierce the corporate veil. But they made that argument, the judge rejected it. So there are tools available to the court, but re-characterization is not one of those tools. They could look under state law, but the only arguments here made under state law relate to consideration. Every single argument made by ITS regarding the enforceability of these notes under state law relate to consideration. Nothing else. That's the only argument made below is consideration. And we know, Your Honor, that under Kentucky law, a peppercorn is sufficient consideration for the enforcement of a negotiable instrument. We know that. We know these were negotiable instruments. And we know that under Kentucky law, the burden of proof with respect to lack of consideration is on the party opposing enforcement of the note. And so they had arguments available to them under state law. They only made one of those arguments. That argument fails because under Kentucky law, there was adequate consideration for the execution of the notes. So there are tools available to the court. It's just re-characterization is not one of them. Your Honor, with respect to whether you can re-characterize the debt of a non-shareholder, there is no case law that I'm aware of other than a case called Atlantic Rancher. In all of bankruptcy court decisions, there's only one called Atlantic Rancher where there was re-characterization of the debt of a so-called non-shareholder. And that involved a situation where the creditor had a convertible note that was convertible into a substantial chunk of the equity of the company and also had control of the company for voting rights purposes. That's one case that I'm aware of where this has occurred. It's not occurred in the Sixth Circuit. I'm aware of no case in the Sixth Circuit where the debt of a non-shareholder has been converted, has been re-characterized as equity. Is the trial court's decision premised on that? Pardon? Is the trial court's decision premised on that forthcoming? It's one part of her decision, yes. She found that one, Cecilia was a non-shareholder. And she also found that they had not made an argument or sufficient showing to find that Cecilia was an insider under the bankruptcy code. So she made those two determinations and she said, if you're not a shareholder and you're not an insider, I don't have a basis to re-characterize the debt as equity. And then she said, but if you are correct, that you should collapse all of these entities into one. She assumed that they were correct. You disregard the corporate veil of every one of these entities. Still don't get there under auto style. Still don't get there under, she went through all the factors. Those are alternative holdings, your honor. She did not confuse the requirements of auto style with the issue of whether or not you need to be a shareholder or insider. She did both and they are in the alternative. So she went through all those factors as if, as the court said, the shenanigans required the collapse of all of those entities into one. And she went through all of those factors. And the standard of review for her decision regarding those factors is clearly erroneous. Her decision is not clearly erroneous in terms of the weight of those factors. We had notes. They were demand notes. By their very nature, they didn't have a payment schedule because a demand note is a demand note. They did have an outside maturity date, but it was irrelevant because, again, they were demand notes. They complied with all the requirements of a demand note under Kentucky law. And as the court knows in auto style, the court recognized that a demand note with a fixed interest rate and payment come to that in a second, is evidence of debt, not equity. General business principles. Pardon? General business principles. Correct. Exactly. So, demand note, 6% interest. Interest was payable pick. Nothing extraordinary about this note. And that's basically the first three factors of the auto style test. The next factors, Your Honor, relate to capitalization. The only evidence in the record regarding ITS's capitalization is the testimony of ITS's sole manager, Mr. Tandon, who admitted two things. One, that ITS was adequately capitalized. And two, that it may have been solvent on a balance sheet basis. I say may because that's what the testimony was. But there was also a report in the record prepared by Mr. Tandon showing equity in ITS beyond its debt. So, there's no evidence here that it was not adequately capitalized. There's no evidence here that it was insolvent on a balance sheet basis. In fact, Mr. Tandon testified that when he was reviewing AWL's loan, to ITS, that he concluded that ITS was able to pay its debts as they became due. That's the definition of cash flow solvency. So, not undercapitalized, not insolvent. Financing from third party sources, another important factor. Would have someone else made this loan? Well, the fact is somebody else did make this loan. But what is the strongest, from your point of view, putting yourself in their shoes, the strongest of the auto style factors and what's your response to it? The strongest factors they have? To favor the debtor in possession. Not fair. No. I just have to be careful with my answer. That was true from when you started. Understood, Your Honor. Well, there was a lack of security here. When I run through the factors, I say, we have notes, they're demand notes, that weighs against re-characterization. The only evidence in the record of solvency capitalization does not support a finding that they were undercapitalized or insolvent. We know they had financing from third parties. We know somebody made exactly the same loan. AWL made an effectively unsecured loan on terms that were not as friendly to ITS as the terms provided by Cecilia. So we know a third party. AWL made a loan. We also know that Baybridge made a loan, unsecured loan, to ITS, $5 million. AWL loan was six. We know those loans were made by third parties. We also know that Baybridge was willing to provide unsecured, not secured, unsecured debt post-petition. But the question was, what factor helps them the best? I think it's source of repayment, quite frankly, because here, the source of repayment depended on the monetization of the sublease. No question about that. So what's your response to that? Because I think I wouldn't disagree with that. So what's your response to that artistile factor? Two things. The factor is, was repayment conditioned on the success of the business? What the court found below was, no, it was not conditioned on the success of the business. It was conditioned on monetization of the sublease, which was, in many ways, similar to a case that you cited involving the sale of a business. It wasn't dependent on the success of the business, but the sale of the business. Realizing the value of the asset. Correct. And so different from the success of the business. And the second thing I would say, Your Honor, is the weight to be given that factor, I have four seconds, but the weight to be given that factor is limited in the context of a distressed debtor. Because it's often the case that shareholders and others, shareholders are the only ones who would have provided credit based on that being the source of repayment, the monetization of that sublease. Here, that's not the case because we know others did. But I think that would be the strongest argument that they have, but I don't think that factor is to be given a lot of weight here in a distressed context. Thank you. Thank you. Thank you, Your Honors. I want to briefly just respond to a couple of points. First and foremost, the notion that the AWL loan was effectively unsecured, that's purely argument. The AWL loan was secured based on all the available assets of the estate. And actually, I believe that's why AWL eventually was able to come in and foreclose on those assets in the bankruptcy. So the notion of, I don't know what effectively unsecured means, it was properly secured on all the assets, it wasn't unsecured. Baberidge's note, however, is another irrefutable point. That note was transferred to the name Mr. Siegel. It was not named to the debtor. So, again, there was not other entities. And we know that, Your Honor, because in the RFAs and in the interrogatories below, we have those admissions from Cecilia. Again, I do want to go back to the point of this notion of substitution. Because that is a very critical point. I'm not going to, you know, try to even mislead the Court in any stretch. The notion of who the party opponent is is a critical factor here. It goes to the weight as to what should be given to the deposition, whether it should be used, the testimony and otherwise. But there's no substitution in terms of the adversary proceeding, Your Honors. There certainly is a transfer of claim procedure. But there is not a single case that we can locate. Who's the real party in interest after the foreclosure of Baberidge's security interest? Cecilia, Your Honor. Real party in interest after the foreclosure? Absolutely, Your Honor. Absolutely. Because Cecilia is the one who has a debt to Baberidge separated in and of itself, in which it essentially traded the value of its claim to Baberidge in order to be, you know, let off the hook for what they owe. So if the Cecilia claim is worth $0, then they don't get the benefit of the deal with Baberidge. I mean, that's the whole point here. It really is Cecilia, Your Honor. They're the ones who, allegedly, the money was owed to. They're the ones who are taking that claim and using it to make a deal with Baberidge. But again, Your Honors, there is nothing in the federal rules, civil procedure, bankruptcy procedure or otherwise, that discusses the use of $3,001 to substitute a properly named party who has joined issue, participated in the litigation, defended depositions and otherwise, and then chooses on its own to simply stop participating. Again, there's no question of notice. Let me ask you to switch gears a little bit. I know it's rebuttal, but this has bothered me about this chipping away, more or less, at the bankruptcy court's equitable powers after Law v. Siegel. Where, you know, where is there room after Law v. Siegel for us to do this kind of thing? Recharacterization. Your Honor, our argument is that it didn't change the bankruptcy court's power to recharacterize. It was a decision, you know, I understand that Baberidge has argued that before, but it was a decision related to the Ninth Circuit use of a completely, really just kind of apples and oranges. We don't think that there's been any decision by the Supreme Court or otherwise which says the bankruptcy court doesn't have the power to recharacterize. Because if it didn't, then... It's fair to say that it doesn't address recharacterization. It was an exemption controversy, I think. But the idea that the court's equitable powers are limited to what happens, you know, what's set forth in the Code, essentially. Right? So where, where? Your Honor, we would hearken back to that it is an, you know, essential power of the bankruptcy court under, at minimum, Section 105 for it to be able to look beyond the words on a page. And numerous cases about recharacterization that both of us have cited, Your Honor, have said this. That the power of the bankruptcy court, you know, should exercise is to look beyond the words on the page, look to the true nature of the transaction, and do equity. And in this particular case, Your Honor, you have an entity who the sole member of it was I.T.H. The sole individual was Mr. Siegel's wife. You had Cecilia. Again, the sole members were Mr. Siegel's wife and children. And on every transaction, every side of every transaction, you have the Siegel family. Again, I'm not suggesting illegal. And I have, Mr. Siegel was a gentleman and a really, you know, forthright at his deposition. But it's just the nature of the transaction. He was putting equity into this business. And the bankruptcy court should have and does have the power to recharacterize it. But you cannot cite us to a single case that supports your position. I can't cite you to a single case, Your Honor. You're asking this court to make new law. Your Honor, I'm not asking this court to make new law in that sense. I'm asking this court to look beyond the words on the pages here and look at who this transaction was. We literally have no third parties. We have the Siegel family, and that's all we have on every which way you look, to every corner of every transaction. So, again, I don't have a case in which these, you know, facts, the way they structured these corporate transactions were done. But I do have the understanding from Mr. Siegel's deposition that they weren't very concerned with corporate formalities. And what he was really trying to do, nobly, was to be able to have this asset available to pay for his grandchildren's education otherwise. And it simply didn't work. But that doesn't make it, you know, a legitimate debt, Your Honors. Thank you. Thank you.